GURNEY *et al.* v. ATLANTIC AND GREAT WESTERN RAILWAY COMPANY.

*Sale — deficiency in quantity and quality of articles sold — duty of vendee — " Employee" — when legal counsel is not.*

A railway company, ordered from a firm of irondealers a certain number of railway " frogs" of a specified quality. The firm sent a less number than that ordered, which was received without objection by the company. Upon using the frogs it was discovered that a portion of them were not of the quality ordered, but the company did not notify the firm of the defect, or offer to return the frogs, but kept the whole and used them. *Held*, that the company could not claim a deduction for the defective quality of the frogs, but were liable for the price agreed to be paid.

It was the duty of the vendee, when it discovered that one or more of the frogs delivered under the contract were not in compliance therewith, if it wished to reject any of the articles delivered, to notify the vendors of the alleged defect, and return or offer to return all the frogs embraced in the contract.

An order provided for the payment, out of moneys in the hands of the receiver of a railway company, of debts owing to " the laborers and *employees*" of the company " for labor and services actually done in connection with that company's railways." *Held,* that the order designed to limit the operation of the word " employee" to such servants of the company as were usually engaged in the construction, operation and maintenance of the company's railways, and did not include one employed as occasional legal counsel of the company.

THESE are appeals from an order directing and refusing payments from a fund in the hands of General Robert B. Potter, receiver, for distribution among the creditors of the Atlantic and Great Western Railway Company. In 1867 actions were brought by Samuel Gurney and others (representing, or in concert with, the great body of creditors of the company) against the Atlantic and Great Western Railway Company, consolidated, which owned railways extending from Salamanca, in this State, through Pennsylvania and Ohio. In that action, and in like actions brought in Ohio and Pennsylvania, General Robert B. Potter was appointed receiver, and entered into possession April 1st, 1867.

The order made by this court provided, among other things, that the receiver, after deducting the expenses of operating the railways, including the purchase of necessary materials and supplies, necessary renewals and repairs, the rent of a railway leased by the Atlantic

and Great Western, and his own compensation and that of his agents and advisers, should, "out of the balance of earnings in his hands, being net earnings, pay and discharge:

"*First.* Any arrearages that may be due and owing for taxes and public assessments on any of said mortgaged property, or owing to the *laborers* and *employées* of the said consolidated corporation, defendants, for labor and services actually done in connection with that company's railways, or to connecting roads on freight or passenger accounts in the ordinary course of business.

"*Second.* Such sums as may remain actually due for materials and supplies furnished said consolidated company, defendants, for the use of its railways," etc.

Similar provisions were contained in the orders made by the courts in Ohio and Pennsylvania.

The receiver continued in possession of the road, making large disbursements of money from time to time, until the fall of 1868, when the company effected an arrangement with its creditors, and thereupon applied, with their consent, for a release of the line. This was ordered upon payment of the receiver's expenditures and liabilities.

Owing to the impossibility of then ascertaining his liabilities exactly, an estimate was made, and it was found that $1,218,750 would be required to pay all the receiver's liabilities over and above all his receipts to the close of December 12, 1868, and he was accordingly ordered, upon payment of that sum by this company, to give up the line and mortgaged property, which he did.

After settling all his known and admitted liabilities, he had a balance left, and thereupon applied by petition for the ascertainment of claims and directions as to its distribution. This court, in April, 1870, ordered advertisements for claims against the receiver, and a reference to ascertain the same. The Ohio court, in June, 1870, directed like advertisements for claims in Ohio. Claims were presented there. Some were allowed; others disallowed. Those allowed were ordered paid by this court, and were paid. Various claims were allowed in New York, and have all been paid.

Beyond, however, the claims against the receiver himself, there were also claims by creditors of the company, entitled, under the provisions of the order appointing the receiver, to be paid out of the fund in his hands. There were also divers claimants for the surplus of the fund.

Three claims only are involved in the present appeal, viz.:

One of Messrs. Naylor & Company, of New York, for steel frogs furnished to the company and to the receiver for $2,886 gold and $92.46 currency. The facts with relation to this claim, as found by the referee, are as follows:

" Prior to the appointment of the receiver, the Atlantic and Great Western Railway Company ordered of Messrs. Naylor & Company two hundred of reversible steel frogs to correspond in all respects with a certain steel frog it had theretofore received and was then using (and which proved to be a good and serviceable article), except in the matter of the length of the frogs, which was to vary slightly from the sample. Naylor & Company sent an order to Vickers & Company, of England, to manufacture the frogs according to the said pattern, that firm having manufactured the frog already in use.

" Seventy-five of the frogs were furnished to the company, upon its orders, between the 1st day of August, 1866, and the 1st day of January, 1869. Twenty-two of the said frogs were delivered to the receiver on, or shortly after, the 27th day of May, 1867.

" Naylor & Company presented bills for said frogs to the receiver in their own names as vendors.

" Most of the frogs, except the sample frog, were found to be brittle, and they did in fact break within a short period after being placed upon the road. They were then of no value for the purpose for which they were ordered.

" After being broken, the railway company, without offering to return them, sold the broken pieces for old iron, and as such they were worth about half of one cent per pound.

" There was nothing in the general appearance of the frogs before use, nor any thing discoverable from a particular examination of them, to show what was their real condition, which could only be tested by actual use."

The second claim was that of Jeremiah S. Black, Esq., for legal services as counsel rendered to the railway company at various times, and amounted to $5,000.

The third claim was that of the firm of Turquand, Youngs & Company, of London, England, for $20,000, for services as accountants. They performed these services for the company at the request of Mr. James McHenry, the president of the company and its financial agent in London. In settlement of this claim, McHenry had

given to the firm four bills, drawn by him on the railway company, which bills were never paid.

The referee held, in respect to the claim of Naylor & Company, that there was no presumption that, because a single frog broke the remainder would do so, and that the company had a right, notwithstanding the fact that one or more frogs may have broken within a very short time after being laid down, to lay down and use the remainder as being necessary in their business. He found that they had no claim on the receiver under the original contract for the frogs delivered; yet, as against the railway company, they might, under the provisions of the order appointing the receiver, and the conclusions arrived at by him as to the ultimate ownership of the fund, be entitled to recover the real value of the frogs delivered, and estimated the amount to which they were entitled to be, $2,410.54 in gold and $450.34 in currency.

The claim of Mr. Black was disallowed, upon the ground that he was neither a "laborer" nor "employee" of the company within the terms of the order appointing the receiver. The referee, however, decided the claim to be reasonable in amount and due from the company.

The claim of Turquand, Youngs & Company was held to be regular, the firm having been regular accountants of the company, and the claim, and the propriety of its being paid out of the fund, being admitted by the company, the sum of $20,000 was allowed, but without interest.

Naylor & Co. excepted to the finding of the referee, allowing their claim *in part* only, Jeremiah S. Black to the disallowance of his claim, and Turquand & Co. to the non-allowance of interest upon their claim.

The court, upon the hearing at special term, sustained the exceptions of Naylor & Co., and directed the payment of their claim in full. It also ordered that the amount due for frogs delivered to the receiver after he took possession of the road, and interest, be made a primary charge upon the fund.

The exception of Turquand, Youngs & Co., in relation to the non-allowance of interest, was sustained, and the receiver was directed to pay them the amount due, with interest, out of the fund, if any remained after the payment of Naylor & Co., and some others in full.

The exceptions taken by Jeremiah S. Black were overruled, and

the report of the referee sustained, the court holding, however, that Mr. Black was an "employee" of the company, but sustaining the finding in the report on the ground that his services were not "actually" performed in "connection" with the railways.

Appeals were taken from the order of the special term by Turquand, Youngs & Co., by Jeremiah S. Black and by Reuben Hitchcock, who had, in actions to enforce the payment of a mortgage upon the railway in question, been appointed receiver, and who claimed an interest in the surplus funds in the hands of receiver Potter.

*Clarkson N. Potter,* for Turquand, Youngs & Co.

*Jeremiah S. Black, in pro. pers.*

*W. W. McFarland,* for Reuben Hitchcock, receiver. (As to claim of Naylor & Co.) A sale of an article by sample and pattern implies a warranty of quality corresponding to the quality of the sample. Benj. on Sales, 482, 483; *Russell* v. *Nicolopulo,* 8 C. B., N. S., 362; *Gallagher* v. *Waring,* 9 Wend. 26; *Waring* v. *Mason,* 18 id. 425; *Moses* v. *Mead,* 1 Denio, 386; *Oneida Manuf. Society* v. *Lawrence,* 4 Cow. 440; *Hart* v. *Wright,* 17 Wend. 274; *Beirne* v. *Dord,* 5 N. Y. 98.

Upon executory contracts for the delivery of a thing to be manufactured, there is an implied warranty that it shall be of fair quality and merchantable, and upon the sale of an article for a particular purpose, there is an implied warranty that it shall be fit and suitable for that purpose. Benj. on Sales, 488; *Brown* v. *Edgington,* 2 M. & G. 279; *Jones* v. *Bright,* 5 Bing. 533; *Laing* v. *Fidgeon,* 4 Campb. 169; *Hallis* v. *Claridge,* 4 Taunt. 808; *Shepherd* v. *Pybus,* 3 M. & G. 868; *Hoe* v. *Sandborn,* 21 N. Y. 561; 3 Kent's Com. 663, note; *Prentice* v. *Dike,* 6 Duer, 223; *Park* v. *Morris,* 4 Lans. 104.

A sale of articles affecting human life implies *per se* a warranty of soundness. *Van Bracklin* v. *Fonda,* 12 Johns. 468; *Wright* v. *Hart,* 18 Wend. 456.

*Vose & McDaniel* and *Everett P. Wheeler,* for Naylor & Co.

TALCOTT, J. [*Appeal against the allowance of the claim of Naylor & Co.*] The frogs in question were ordered of Messrs. Naylor & Co. by four different orders made at different times. By

each order twenty-five frogs were directed to be furnished to the company. Three orders were made by the company, on each of which orders twenty-five frogs were delivered, and one order by the receiver on which twenty-two frogs were delivered and received without objection that the order was not complied with as to the number. The frogs were received and used by the company and receiver without objection or any offer to return. This, under ordinary circumstances, would preclude any objection on the part of the vendee that the quality of the frogs did not fulfill the requisites of the orders, according to the case of *Reed* v. *Randall*, 29 N. Y. 358, and other kindred cases referred to by the respective counsel. The referee, however, has found as facts that there was nothing in the general appearance of the frogs before use, nor any thing discoverable from a particular examination of them to show what was their real condition, which could only be tested by actual use, and that there was no presumption that because a single frog broke in using, the remainder would do so, and he held " that the company had a right, notwithstanding the fact that one or more frogs may have broken within a very short time after being laid down, to lay down and use the remainder as being necessary in their business."

We concede that the rule applied in the case of *Reed* v. *Randall* is not applicable until the vendee has had a reasonable opportunity to know or ascertain, by the methods necessary for that purpose, whether the articles delivered under an executory contract of sale comply with the contract. Such is the admitted doctrine of the cases referred to. But the error of the referee consists, as we think, in supposing and holding in effect that, where several pieces of a particular description of goods have been ordered by one order, so as to constitute but one contract of sale for the whole number, the vendee has a right to retain a part and reject the residue as not being in compliance with the contract as to quality. The right to reject goods delivered or tendered under an executory contract of sale and purchase, on the ground of the insufficiency of the quality, results from the fact that goods of a different kind or inferior quality were not contracted for, and the offer or delivery of such different or inferior articles is not in pursuance of the contract, and the default of the vendor is that he has not performed, or offered to perform, the contract of sale and purchase actually made between the parties. Under an express warranty different rights arise. The vendee is not obliged to return or offer to return the property, but

may retain and use it, and have recourse against the vendor for all damages sustained in consequence of the quality of the article being inferior to that warranted, and, therefore, in such a case as this, under an express warranty the railroad company might have received and used all the frogs, and, if any of them proved defective and inferior to the quality warranted, have been entitled to recover of the vendors the damages sustained by reason of the defective quality of such of the frogs as proved deficient. But the vendee has no right to divide the contract and reject a portion of the attempted performance, while he receives and appropriates the residue. In this case there were four several executory contracts for twenty-five frogs each. Each of these contracts was entire and indivisible, except by the consent of both parties. When, therefore, the vendee discovered that one or more of the frogs delivered under any of these contracts was not in compliance with the contract, but was defective in quality, if he wished to reject any of the articles delivered under that contract, the duty devolved upon him of notifying the vendor of the alleged defect, and return-ing, or offering to return, all the frogs embraced in that contract. The referee proceeded upon the opposite theory, and held that as it was for the convenience of the vendee to retain and use a part of the articles delivered, he might, at his option, divide the con-tract, keep a part of the articles upon the contract, and reject the residue because not in compliance with the contract. This, we think, the vendee cannot do. If the contract has been complied with, the vendee gets title to all the articles embraced in it, if not, and the vendee on that ground repudiates the attempted perform-ance, he gets title to none. This principle may, in certain cases, be productive of inconvenience to the vendee. Where this is appre-hended, he can easily guard himself against the operation of the rule by the terms of his contract. If he neglects to do this, he must put up with the inconvenience. He cannot make a different contract for the vendor from that which the latter has consented to enter into.

The order of the special term, therefore, allowing the claim of Nay-lor & Co. at the full amount of the contract price for the frogs delivered is affirmed.

### [APPEAL OF JEREMIAH S. BLACK, ESQ.]

The appellant was employed as casual and extraordinary counsel of the railway company in various cases, and presents a claim upon the

fund in the hands of the receiver for the balance found to be justly due him from the company on account of counsel fees in such cases. The rights of the appellant depend, as is conceded, wholly upon the provisions of the order under which the fund comes to the hands of the receiver. The first provision of the order, as to the disposition of the funds which may come to the receiver's hands, is as follows, viz.:

"First. Any arrearages that may be due and owing for taxes and public assessments, on any of said mortgaged property, or owing to the *laborers and employees* of the said consolidated corporation defendants *for labor and services actually done in connection with that company's railways,* or to connecting roads on freight or passenger accounts in the ordinary course of business." It is upon this provision of the order that the appellant founds his claim, to be paid out of the fund in the hands of the receiver, and he claims that as such counsel as aforesaid, he was an "employee" of the company within the meaning of the order.

In this, we think, he is mistaken. The word "employee" is from the French, but has become somewhat naturalized in our language. Strictly and etymologically it means "a person employed;" but in practice in the French language, it ordinarily is used to signify a person in some official employment, and as generally used with us, though, perhaps, not confined to any official employment, it is understood to mean some permanent employment or position. Associated as it is with the word "laborers," and especially limited to services actually done in connection with the company's railways, and by the rule *noscitur a sociis,* applied to a similar question in *Aikin* v. *Wasson,* 24 N. Y. 482, there can be little doubt that the court making the order designed to limit the operation of the word to such servants of the company as were usually engaged in the construction, operation and maintenance of the company's railways, a class of persons, as is said by the court in *Ericcson* v. *Brown,* 38 Barb. 390, who are not well qualified to protect themselves, usually labor for a small compensation, and are deemed, to a certain extent, to be in the power of the employer. And also to those to whom the withholding of their dues, though small in individual cases, would produce a large amount of distress; and who, from ignorance of laws and legal proceedings, and moved by their common necessities and vague, but acute sense of wrong, may be led to proceedings of a riotous character, endangering the property which the interest of all concerned requires should be pro-

tected and preserved. We think it quite clear that the appellant was not designed by the order to be embraced in that class of persons therein described as "laborers and employees," the debts due to. whom the receiver was directed to first pay.

And, accordingly, we must affirm the order disallowing the debt due to the appellant Black, as a specific claim against the fund in the hands of the receiver.

### [CLAIM OF TURQUAND, YOUNGS & COMPANY.]

Turquand, Youngs & Co., professional accountants, in London, were employed by the railway company in auditing the accounts and keeping the books of the company in London, and reporting upon the affairs thereof, for a certain space of time, for which services there became due to them from the company a sum liquidated at $20,000. Five thousand dollars of this was paid by the company, and the balance was allowed by the referee in this proceeding. The payment of the claim of Turquand, Youngs & Co. was by the special term postponed to the claim of Naylor & Co., and from so much of the order of the special term as allows the claim of Naylor & Co., and from so much as postpones the lien of Turquand, Youngs & Co. to that of Naylor & Co., Turquand, Youngs & Co. appeal.

As to the allowance of the claim of Naylor & Co., our views have already been expressed. We consider the order of the special term, postponing Turquand, Youngs & Co. to Naylor & Co., to be correct, for the following reasons:

The second provision of the order, under which the fund came to the hands of the receiver, directs him to pay out of it secondly, " Such sums as may remain actually due for materials and supplies, furnished said consolidated company defendants for the use of its railways," not exceeding in the aggregate the amount of materials and supplies which may be delivered by the company to the receiver. The claims of Naylor & Co. come within this description, as to the first two parcels of frogs. And as to those delivered to the receiver, who by the order is authorized to operate the road, of course they are to be paid out of the fund. The claim of Turquand, Youngs & Co. is not provided for by the order, or in any way made a specific lien on the fund. The only ground upon which the claim was allowed by the referee is, that the railway company had admitted the claim, and specifically appropriated its interest in the

fund to its payment. The interest of the company was subordinate to the specific lien created by the order. The postponement, therefore, so far as this fund is concerned, of the claim of Turquand, Youngs & Co. to that of Naylor & Co., seems to be in accordance with the equitable rights of the parties.

We think, therefore, that the order appealed from should be, in all particulars, affirmed with $10 costs on each appeal, to be paid out of the fund.

*Order affirmed.*